**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 98-21114

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARK ALBERT MALOOF,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

March 2, 2000

Before JONES, DeMOSS and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

This direct criminal appeal arises from the conviction following jury trial of Mark Albert Maloof (Maloof) for conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. For the reasons assigned, we affirm the convictions, but vacate the sentences, and remand for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Maloof served as the southern regional sales manager for Bay

1

Industries, Inc. (Bay), a company which produces and sells metal building insulation. Bay opened a Houston office in 1993 and recruited most of Brite Insulation Company's (Brite) sales force as its employees. Bay sharply reduced prices to attract customers, including many of Brite's major customers. Sales representatives from Bay's competitors responded by reducing their prices to generate additional sales.

One of the major components of metal building insulation is fiberglass. In 1993, fiberglass manufacturers doing business in Texas announced a price increase and reduction in the supply of fiberglass insulation. As a result of these changes Daniel Schmidt (Schmidt), Bay's general manager, prepared a price sheet in November 1993 outlining the new pricing scheme for Bay's sales representatives.

On January 3, 1994, Maloof, Bay's regional sales manager, called Wally Rhodes (Rhodes), vice president of sales for Mizell Brothers Company (Mizell), one of Bay's competitors. Rhodes, testifying on behalf of the government, stated that they discussed the effect of the insulation supply reduction and Rhodes' marital problems. Rhodes said Maloof suggested adopting uniform pricing to ensure that neither company would quote or sell under the other's prices. According to Rhodes, Maloof faxed Bay's price sheet to him. The prosecution introduced telephone records documenting phone calls and faxes between Maloof's phone line and Mizell on a daily basis the following week. Rhodes and Maloof stated that

2

Maloof used the name Tom Coop when he called Rhodes during business hours. Rhodes testified that the purpose of the calls was to revise Mizell's price sheet to conform with Bay's pricing. Maloof stated that each of his conversations with Rhodes concerned only Rhodes' marital problems and that he never faxed or received price sheets from Rhodes.

Other witnesses for the prosecution testified that Maloof was involved in the solicitation of additional competitors to participate in the conspiracy to adopt uniform prices. Rhodes testified that prior to a laminators' trade association meeting in Kansas City on January 11, 1994, he and Maloof agreed to ask representatives of other insulation suppliers to join in the price fixing agreement. At the meeting, Rhodes said, he discussed the plan to adopt uniform prices with Brite employees, Peter Yueh and Jerry Killingsworth. Rhodes testified that he and Maloof decided that Rhodes should approach the Brite representatives first because of hard feelings and possible litigation resulting from Bay's hiring raid upon Brite's sales force. Killingsworth testified that his agreement for Brite to participate in the price fixing plan was obtained by Rhodes in the presence of Maloof during a smoke break. Rhodes corroborated Killingsworth's testimony. Following this meeting, Rhodes testified, he informed Maloof of Killingsworth's agreement upon Brite's participation and faxed the uniformly adjusted Mizell and Bay price sheets to Killingsworth, who prepared a Brite price sheet that was almost identical. Several weeks later

3

Killingsworth stated that he sent the Bay, Brite and Mizell price sheets to the PBI Supply Company (PBI). Killingsworth testified that PBI faxed him a price sheet that was very similar to those of the other companies. Maloof denied having had any knowledge of the discussion between Rhodes and either Killingsworth or Yueh during the Kansas City meeting.

Fiberglass manufacturers imposed three price increases in 1994 and one in 1995. According to government witnesses, following each increase Maloof shared Bay's price sheet with representatives of Mizell, Bright and PBI. While Maloof denied participating in a conspiracy to adopt uniform prices with any competitor, Rhodes and Killingsworth testified that they agreed upon a pricing scheme with Maloof before distributing new price sheets to their sales representatives. Several Bay employees stated that they complied with Maloof's directive to adhere to Bay's price list because he had little tolerance for deviations. Maloof admitted that he informed Bay sales representatives that they had to adhere to that price list.

In 1994, Bay sales representatives began to receive complaints from some Bay customers that competing sales representatives consistently gave quotes identical to Bay's for 3 inch white vinyl insulation. Bay sales representatives testified that when they relayed the complaints to Maloof, he instructed them to stop selling to those customers.

Janne Smith, who worked for Bay as a division manager under

4

Maloof's supervision, testified that she overheard Maloof discussing Bay's prices with Rhodes. She said that Maloof faxed Bay's price sheet to Rhodes and informed her that he had to consult Rhodes before approving a customer's request for a discounted price. According to Smith, Maloof gave her a copy of Mizell's price sheet in May 1994 and said that these were the prices Bay would adopt following the next price increase by the manufacturers. Smith also testified that Maloof fired Deloris Hill, a Bay sales representative, for charging prices below the stipulated rates.

Smith stated that because of her observations she suspected Maloof was violating antitrust laws. She testified that in July 1994 she faxed Maloof a document entitled the "Eight Major Fundamentals of Antitrust Law" and discussed her concerns with him. According to Smith, Maloof stated that he could not undo what had already been done. Maloof denied receiving a document on antitrust principles from Smith or discussing it with her.

Several weeks later, Smith reported Maloof's activities to the FBI and agreed to record some of her conversations with him in exchange for immunity. In June 1995, FBI agents and government prosecutors offered Maloof immunity in exchange for cooperating in the government's antitrust case. Maloof refused the offers. On May 15, 1997, Maloof was indicted on one count of conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. Maloof was convicted by a jury of

both counts and sentenced to 30 months imprisonment on each count, to run concurrently, and fined $30,847.  Maloof appealed.

## II.  DISCUSSION

Maloof assigns several errors on appeal, including the trial court's limitations of his direct testimony and cross-examination of government witnesses, the court's application of a four level sentence enhancement, prosecutorial violations, judicial restriction of his "consciousness of innocence" defense, and the admission of the guilty pleas of witnesses-accomplices as substantive evidence of his guilt.  After considering the oral arguments of counsel, the parties' briefs and the record designated for appeal, we conclude that Maloof's argument concerning his sentences has merit but that his assertions of errors affecting his convictions lack reversible merit.

Maloof's argument that he was deterred from adequately presenting a "consciousness of innocence" defense is unmeritorious. He relies on United States v. Biaggi, 909 F.2d 662, 689-91 (2d Cir. 1990), cert. denied, 499 U.S. 904 (1991), in which the court of appeals held that evidence that defendant had rejected an offer of immunity from the government in exchange for testifying as to the wrongdoing of others is relevant and admissible to show defendant's "consciousness of innocence."  In Biaggi, the court reasoned that, although plea negotiations are inadmissible against the defendant, see FED. R. CRIM. P. 11(e)(6)and FED. R. EVID. 410, it does not

6

necessarily follow that the government is entitled to a similar shield, and, more fundamentally, that the two types of negotiations differ markedly in their probative effect when they are sought to be offered against the government. "When a defendant rejects an offer of immunity on the ground that he is unaware of any wrongdoing about which he could testify, his action is probative of a state of mind devoid of guilty knowledge." Biaggi, 909 F.2d at 690. In Biaggi the court of appeals reversed bribery convictions because the trial court, unlike the district court in the present case, had completely excluded evidence of the defendant's rejection of immunity under circumstances in which that evidence might well have affected the jury verdict. Id. at 692.

Maloof was permitted to testify that he had rejected two government offers of immunity, one by two FBI agents and another by two Department of Justice attorneys, in exchange for taping conversations with his employer and other individuals, explaining to the agents and attorneys that his company could sell all of the insulation it had without price fixing and that he had no knowledge of any price fixing by his company or others. He complains, however, that the trial court erred in (1) instructing the jury to disregard his testimony that the FBI agents had knocked on his door and called out, "Mr. Maloof, this is the FBI, you're going to jail for three years;" and (2) limiting his testimony to the substance of the conversations relating to the offers of immunity, his rejection of the offers and his explanation of lack of knowledge of

7

wrongdoing, and disallowing his testimony to what he considered to be threats and attempted intimidation of him by the government agents.

We conclude that the trial court correctly applied FED. R. EVID. 401, 410 and 403 as interpreted in Biaggi by allowing Maloof to testify to the sum and substance of the offers and rejections of immunity; and did not abuse its discretion under FED. R. EVID. 403 to bar embellishing details on the grounds that their probative value was outweighed by the danger of unfair prejudice, confusion, or delay.

Maloof argues that the prosecution violated Giglio v. United States, 405 U.S. 150 (1972), Brady v. Maryland, 373 U.S. 83 (1963) and the Jencks Act, 18 U.S.C. § 3500, by withholding a December 3, 1993 letter written by prosecution witness Killingsworth that directly contradicted his testimony regarding the distribution of Brite's January 1, 1994 price sheets. Under Brady, exculpatory evidence is discoverable by the defendant where it is "material to guilt or punishment." Brady, 373 U.S. at 87. Information is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Rosario-Peralta, 175 F.3d 48, 53 (1st Cir. 1999) (citation omitted). The Jencks Act requires the government to provide, upon request, any prior statements of government witnesses that relate to the subject matter of their testimony. See 18 U.S.C. § 3500(b). A statement

8

includes a written statement made by the witness and signed or adopted by him. See 18 U.S.C. § 3500(e)(1). To succeed under the Jencks Act, the defendant must demonstrate that he was prejudiced by the failure to disclose. See Rosario-Peralta, 175 F.3d at 53.

Killingsworth testified that at a trade association meeting in Kansas City in January 1994 he agreed to a proposal by Rhodes and Maloof that Killingsworth's company, Brite, join their companies, Mizell and Bay, in an agreement to fix prices and to publish a common or substantially identical price list. Killingsworth said that prior to this agreement there had been no such direct collaboration by the companies in price fixing, although Brite and its competitors had distributed price lists to customers and had been indirectly influenced in pricing by competitors' price lists or quotes passed on to them by their customers. On cross-examination, Killingsworth identified several Brite price lists dated February 1992, November 1992 and March 1993 that he said had been sent to specific customers. He agreed that the March 1, 1993 price sheet was a "sample of what should be a larger stack" and that he had prepared documents similar to it for manufacturers he either was getting business from or was trying to get business from. In response to further questions on cross-examination, Killingsworth testified:

    Q.  . . . [I]n fact in 1992 and in '93 Brite
        insulation had put out, in the Houston market
        area, written, printed price information to
        various customers?
    A.  That is true.

9

                              * * *

    Q.  You would not want us to think that your
        testimony was that for five years prior to
        1994 there was no written price information
        put out in this market by Brite Insulation;
        that's not correct, is it?
    A.  Not correct, no, sir.

On cross-examination, Killingsworth identified a Brite price sheet dated January 1, 1994 marked Defendant's exhibit 28 and agreed that it seemed to be a price sheet that he had prepared. On redirect examination, Killingsworth testified that the price sheet marked Defendant's exhibit 28 was not distributed to customers because it was not intended for that use. In the context of his entire testimony it is apparent that he meant that the list was intended for internal company use.

    Maloof moved for a new trial on the ground that Killingsworth had presented false testimony in saying the price sheet marked exhibit 28 was not distributed to customers, that the government did not correct this evidence it knew or should have known was false, and that the government had violated Brady by withholding a letter that would have shown that Killingsworth testified falsely. Maloof attached to his motion, as appendix no. 10, a copy of a letter from Killingsworth dated December 3, 1993 to Supreme Insulation in Kansas City regarding "1994 Insulation Prices" stating, inter alia, "Brite Insulation is enclosing our price sheets for North & South Louisiana and Texas attached." Maloof also contends, without dispute by the government, that a copy of the Brite price sheet marked as Defendant's exhibit 28 was attached

10

to the letter when it was mailed to Supreme Insulation.

Maloof argued in his motion for new trial that Killingsworth's letter, which the government had obtained prior to trial in response to a grand jury subpoena, was not only Brady material but also shows that Killingsworth's testimony was false and that the government let it go uncorrected at trial although it knew or should have known it was false. The government responded that Killingsworth's letter to Supreme Insulation does not effectively impeach his testimony, prove that it was false or that false testimony was knowingly presented by the government. The prosecution points out that when Killingsworth testified about distributing price sheets he made a clear distinction between distributions to competitors and those to customers. Further, the government contends that Supreme Insulation was primarily a competitor of Brite, a co-target in Brite's grand jury investigation, and that Supreme Insulation was not a direct user or consumer of the product, i.e., it was not a metal building manufacturer. Killingsworth's letter to Supreme Insulaltion tends to support the conclusion that he was trying to sell to it as a competitor for resale. In the letter he distinguished between one column of prices as "what Brite will charge you for the materials[]" and "[t]he other prices . . . we suggest be quoted to your customer based on market pricing for this area, but you are free to sell it for what you wish to over the minimum."

The trial court rejected Maloof's arguments in denying his

11

motion for a new trial, concluding, in essence, (1) that he had failed to prove that Killingsworth's testimony was false because the Killingsworth-Supreme Insulation letter did not necessarily contradict his testimony in that he had testified at trial that he had distributed price sheets to special customers prior to January 1, 1994 and that Maloof had not demonstrated that Supreme was a customer rather than a competitor or that it was a buyer in the Texas market; and (2) the court was not persuaded that the letter was truly exculpatory or impeachment evidence or that it was of such a serious nature as to be material under the Brady standard.

Maloof presents similar arguments for reversal of his conviction on appeal. We agree with the trial court and the government that Maloof failed to show that Killingsworth's letter to Supreme Insulation contradicted his testimony or that Killingsworth's testimony was false. Consequently, we do not reach the question of whether there was false testimony that could in any reasonable likelihood have affected the judgment of the jury. See United States v. Bagley, 473 U.S. 667, 678-79 (1985); Giglio, 405 U.S. at 154 (quoting Napue v. People of State of Illinois, 360 U.S. 264, 271 (1959)); Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993). Further, assuming without deciding that the Killingsworth-Supreme letter was evidence that the government was obliged to disclose under Brady, we agree that the evidence was not material under the Brady standard because Maloof has not demonstrated that there is a reasonable probability that, had the

12

evidence been disclosed to the defense, the result would have been different. See Bagley, 473 U.S. at 682-83.

In addition, we agree that there was no Jencks Act violation. The harmless error doctrine is strictly applied in Jencks Act cases. See United States v. Ramirez, 145 F.3d 345, 357 (5th Cir.), cert. denied, 119 S. Ct. 602 (1998). A failure to produce Jencks Act material at trial is harmless error where there is no "substantial inconsistency, contradiction or variation" between the prior statements and the witness' trial testimony. See United States v. Keller, 14 F.3d 1051, 1055 (5th Cir. 1994) (citation omitted). As previously noted, there was no contradiction between Killingsworth's testimony and his letter to Supreme Insulation. Thus, the fact that the government did not produce the Killingsworth letter does not mandate a new trial. See Ramirez, 145 F.3d at 357 ("the government's failure to comply with the Jencks Act does not per se require a new trial . . . if the error was harmless, a new trial would not be required.").

Maloof also argued for a new trial and now contends on appeal that the government's failure to disclose a statement made by Danny Fong to the FBI violated Brady. We conclude, however, that the statement made by Fong to FBI agents on June 21, 1995 was not Brady material because Maloof's defense counsel had obtained Fong's version of the facts from his attorney. See United States v. Meros, 866 F.2d 1304, 1309 (11th Cir. 1989) ("[T]he government is not obliged under Brady to furnish a defendant with information

13

which he already has or, with any reasonable diligence, he can obtain for himself." (citation and internal quotations omitted)).

Maloof's witness-accomplice conviction argument is without reversible merit because the district court instructed the jury to consider the guilty pleas of Maloof's accomplices only when weighing the credibility of their testimony. See United States v. Mitchell, 31 F.3d 271, 276-77 (5th Cir.) ("a witness-accomplice's guilty plea may be admitted into evidence if it serves a legitimate purpose and a proper limiting instruction is given."), cert. denied, 513 U.S. 977 (1994). The prosecution had a legitimate purpose for introducing the plea agreements because defense counsel advised the court that he intended to rely on the plea agreements to demonstrate bias and motive. See United States v. Valley, 928 F.2d 130, 133 (5th Cir. 1991).

Maloof contends that the district court improperly limited his direct testimony concerning the content of his telephone conversation with Rhodes on January 3, 1994. Rhodes' testimony that he and Maloof agreed to maintain price levels during that conversation was very important to the government's case. Equally vital to the defense was the persuasiveness of Maloof's testimony that their conversation had nothing to do with prices but focused exclusively on Rhodes' divorce and his desire to be employed by Bay. Maloof testified they talked about Rhodes' divorce problems, but the trial court prevented Maloof from relating specific details that Rhodes had disclosed about the nature and source of his

14

marital strife. Maloof argues that his testimony was unfairly deprived of its full force and credibility when the court prevented his complete and detailed recounting of the conversation with Rhodes.

The district court's restrictions on direct examination are reviewed for abuse of discretion. See United States v. Martinez, 151 F.3d 384, 390 (5th Cir. 1998), cert. denied, 119 S. Ct. 572 (1999). The district court has broad discretion in managing its docket including maintaining the pace of the trial by interrupting counsel or setting time limits. See Sims v. ANR Freight System, Inc., 77 F.3d 846, 849 (5th Cir. 1996). Reasonable limits on questioning "based on concerns about . . . harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant" are permissible. United States v. Gray, 105 F.3d 956, 964-65 (5th Cir.), cert. denied, 520 U.S. 1246 (1997) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). We conclude that the limitation of Maloof's testimony was reasonably based on the trial court's perceived danger of unfairly prejudicial effects upon the jury by the introduction of irrelevant and scandalous information.

During direct examination, Maloof stated the following:

Q: Did you, during January of 1994, have telephone conversations to and from Mr. Maloof?
A: Mr. Maloof?
Q: I'm sorry, Mr. Rhodes. Thank you, Mr. Maloof.
A: Yes.
Q: What was the nature of those calls?

15

A:  Well, there was several calls.  Wally had expressed a dissatisfaction with working at Mizell Brothers and wanted me to ask Dan to get him a job.  He had called me to complain about there was some Bay employees who had told some other Bay employees about his –

Opposing Counsel: Your honor, I'm going to object to this.

Court: I'm going to allow it.

Q:  Go ahead, Mr. Maloof.

A:  Wally was either getting a divorce or had gotten a divorce and he called me.

Court: You can be very general.  You've discussed his divorce or marital issues, is that what you are going to talk about?

A:  He asked me –

Court: Wait, wait, stop.  I do not want any detail.

A:  He wanted the employees to stop talking about –

Q:  His domestic situation?

A:  His domestic situation.

Q:  Pardon me for leading, your honor.

Court: That's fine.

Q:  When he said he wanted the employees, did he mean the employees of Mizell or Bay?

A:  Of Bay.

***

Q:  There are calls in January of 1994 to Mr. Rhodes' home, are there not?

A:  Yes.

Q:  Why did you call Mr. Rhodes at his home?

A:  The personal things that he wanted to talk about and the questions about gaining employment with Bay he did not want to talk about at Mizell Brothers, so he had called an employee at Bay and asked the employee to have me give him a call at the house.

Q:  Of the calls that you had with him in January, how many, how much of the, if you have a judgment, how much of the time that you spoke with him had to do with either the employment or the personal matters?

A:  90 percent.

Maloof conveyed the fact that he discussed several topics with Rhodes and that their conversation was primarily personal in nature.  He stated that Rhodes had gone through a divorce and had

16

called him to complain about the fact that Bay employees were discussing his personal affairs. The district court limited Maloof's direct testimony on the issue of Rhodes' divorce by interrupting him several times. In the district court's judgment, Maloof's testimony of additional details that Rhodes had revealed about his marital controversy would have been unfairly prejudicial and of little probative value to the jury in its assessment of the witnesses' credibility with regard to whether they conspired to fix prices. We conclude that the district court stringently exercised but did not abuse its discretion in limiting Maloof's testimony regarding Rhodes' marital vicissitudes.

Contrary to Maloof's argument, the district court did not abuse its discretion by unduly restricting Maloof's counsel in cross-examining Rhodes. The district court has "wide latitude to impose reasonable limits on cross-examination subject to the Sixth Amendment requirement that sufficient cross-examination be permitted to expose to jurors facts from which they can draw inferences relating to the reliability of witnesses." Martinez, 151 F.3d at 390. The Sixth Amendment is not violated by limitations on cross-examination if the jury is presented with sufficient information to "appropriately draw inferences relating to the reliability of the witnesses." United States v. Landerman, 109 F.3d 1053, 1061 (5th Cir.), cert. denied, 522 U.S. 1033 (1997). The trial court's limitation on cross-examination into the details of Rhodes' divorce did not implicate the Confrontation Clause, as

17

additional information about Rhodes' personal problems would not have informed the jury of Rhodes' "considerable incentive to . . . 'slant, unconsciously or otherwise, his testimony in favor of or against a party.'" Id. (internal quotation omitted). On the other hand, Rhodes was questioned extensively on cross-examination about the details of his plea agreement. The jury was informed that Rhodes was facing a sentence of up to three years and the government would recommend a sentence of four months in the event that he cooperated fully. Thus, the Sixth Amendment was not violated because Maloof's cross-examination of Rhodes elicited sufficient evidence with which the jury could appropriately assess Rhodes' credibility.

In the absence of any constitutional violation, district court rulings on the length and scope of cross-examination are reviewed for abuse of discretion. Gray, 105 F.3d at 964. In order to obtain relief, the defendant must show that the trial court's restrictions on questioning witnesses were "clearly prejudicial" based on the overall strength of the government's case, the circumstances surrounding the challenged testimony and the importance of that testimony and its corroboration or contradiction at trial. Id. at 965.

Considering all of these relevant factors, the trial court's limitations upon the cross-examination of Rhodes were not prejudicial. Maloof's argument is factually incorrect in asserting that Rhodes testified on direct that their conversation dealt

18

exclusively with establishing a conspiracy to maintain prices. Rhodes in fact testified on both direct and cross-examination that they had discussed both. The trial court excluded cross-examination only as to the elaborate details of Rhodes' personal problems.

Thus, after Rhodes answered on cross-examination that he was divorced prior to his January 1994 conversation with Maloof, the court sustained Rhodes' objection as to a further question seeking the exact date of the divorce because that detail was lacking in probative value. The ruling was not clearly prejudicial because the date of Rhodes' divorce had only a marginal relation to whether he discussed price fixing with Maloof in addition to personal problems. Moreover, there was an abundance of other evidence to support the verdict, including the testimony of Killingsworth and Smith; Maloof's tape recorded conversations with Smith; the records of phone calls among the co-conspirators at crucial times; and the competitors' price sheets reflecting orchestrated price increases.

Maloof challenges the district court's four level sentence enhancement under U.S.S.G. §3B1.1(a), which provides that the court shall increase a defendant's offense level by four levels if he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Section 3B1.1(a) is satisfied if there is proof that the defendant led at least one of the participants in the criminal activity. See United States v. Okoli, 20 F.3d 615, 616 (5th Cir. 1994).

19

Maloof argues that the conspiracy did not involve "five or more participants" and that he was not an organizer or leader. The commentary to §3B1.1 defines a participant as a person who is criminally responsible for the commission of the offense but who need not have been convicted. U.S.S.G. §3B1.1, comment. (n.1).

The district court concluded that the involvement of Maloof, Rhodes, Killingsworth and three Bay employees (Janne Smith, Nancy Jensen and Delores Hill) satisfied the five participant requirement. Maloof argues that the district court failed to apply the correct legal standards and clearly erred in its factual findings in determining that each of these individuals was a participant. During the sentencing proceeding the district court stated: "Jane Smith was a participant in the conspiracy for a period of time, at least, insofar as she carried out instructions of the Defendant. Whether she had criminal intent or not is irrelevant." Further, the district court did not otherwise indicate that it had determined that Smith, Jensen or Hill had intentionally or willfully participated in the criminal conspiracy or point to the evidence in the record that would support such a finding.

We agree with Maloof that the district court erred in concluding that Smith, Jensen and Hill were participants without first determining that each of them was criminally responsible for commission of an offense. "A finding that other persons 'knew what was going on' is not a finding that these persons were criminally

20

responsible for commission of an offense.  Willful participation is an essential element of the crime of conspiracy; mere knowledge of a conspiracy does not itself make a person a conspirator." United States v. Mann, 161 F.3d 840, 867 (5th Cir. 1998)(citing United States v. D'Angelo, 598 F.2d 1002, 1003 (5th Cir. 1979)), cert. denied, 119 S. Ct. 1766 (1999).  Consequently, we vacate Maloof's sentences and remand the case to the district court with instructions to clearly articulate the  legal and evidentiary bases for the punishment to be imposed and to resentence him accordingly.

We find no merit to Maloof's other challenges to the district court's determination that he was an organizer or leader of the conspiracy, including his contention that he did not exercise control of persons other than Bay employees under his supervision. In determining whether a defendant was an organizer or leader, the court considers such factors as "the defendant's exercise of decision making authority, the nature of the defendant's participation in the commission of the offense, and the degree of control and authority the defendant exercised over others." United States v. Ayala, 47 F.3d 688, 689-90 (5th Cir. 1995).  The evidence is sufficient to support findings that Maloof initiated the proposal to maintain uniform prices and contacted Rhodes in January 1994 to solicit his agreement; that based upon this conversation, Rhodes agreed to adopt identical prices for Mizell's sales representatives; that Maloof encouraged and directed Rhodes' enlistment of additional conspirators and was actively involved in

21

the operations of the conspiracy, as he regularly exchanged price sheets with his competitors, recommended higher freight charges for customers, monitored Bay sales representatives' adherence to the agreement and informed Rhodes when sales representatives from other companies deviated from the agreed upon pricing; that Smith, Jensen and Hill worked for Bay under Maloof's supervision; and that Maloof directed Smith to adhere to the price sheet and played a role in Hill's firing when she would not comply with his requests.

### III. CONCLUSION

For the reasons assigned, the convictions of the defendant - appellant Maloof are AFFIRMED, but the sentences are VACATED, and the case is REMANDED FOR RESENTENCING in accordance with law and this opinion.

22