**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-50724

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

VERSUS

BRIAN RUSSELL STEARNS,

Defendant - Appellant.

Appeal from the United States District Court
For the Western District of Texas, Austin

(A-99-CR-230-All-JN)

July 23, 2002

Before WIENER and DENNIS, Circuit Judges, and DUPLANTIER,[*] District Judge.

PER CURIAM:[**]

Brian Russell Stearns was charged in an eighty-two count superseding indictment with securities fraud, mail fraud, wire

---

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

[**]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

fraud, making false statements, Social Security Card fraud, money laundering, and possessing a firearm as a felon. Stearns pleaded not guilty, and the case was tried before a jury. During trial, the government voluntarily dismissed counts sixteen and seventeen, and the jury convicted Stearns on the remaining counts. The district court sentenced Stearns to an aggregate term of imprisonment of 360 months and to an aggregate term of supervised release of five years. The district court ordered Stearns to pay $36,054,990 in restitution and an $8,000 special assessment. Stearns appeals his conviction on count fifty-five and his sentence. We AFFIRM.

## I.   FACTS

From February 1998 to February 2000, Stearns, then a resident of Austin, Texas, operated a vast Ponzi scheme.[1] He made false representations to investors and lenders concerning his background, financial status, and occupation. Stearns represented himself as a "Master Trader" and purported to sell and trade securities, medium-term notes, high-yield European bank debentures, and bonds. He further represented that he owned $2.3 billion worth of Barclays Bank bonds and $40 million worth of Federal Home Loan Bank bonds,

---

[1] "Ponzi was the last name of the swindler in Cunningham v. Brown, 265 U.S. 1 (1924). The term has come to be used to describe a scheme whereby the swindler uses money from later victims to pay earlier victims." Guidry v. Bank of LaPlace, 954 F.2d 278, 280 n.1 (5th Cir. 1992).

which would be used to secure and guarantee his investors' funds. Stearns forged documents to provide support for these and other misrepresentations.

Over the course of his scheme, Stearns had over 350 victims who invested almost $60 million. To promote his scheme, Stearns used the help and services of several sophisticated individuals such as Phillip Wylie, Stearns's attorney, and Robert Caron, a broker and manager of Peregrine Strategies investment fund. Wylie acted as a collateral agent on some loans and investments for Stearns; received money from a number of Stearns's investors; and, at Stearns's direction, wired the money to Stearns's personal accounts and purchased a $3 million Lear Jet for him. Similarly, Caron received payments from Stearns's investors and wrote letters on behalf of Stearns to prospective investors stating that he and Stearns had done multimillion dollar deals together. Both Wylie and Caron accompanied Stearns to a meeting with a bank officer from Bank of America regarding a $20 million loan, in which they asserted that Stearns owned the $2.3 billion Barclay Bond free and clear.

Perhaps most importantly, Stearns employed the help of another broker, Jerry Vosselman, to further facilitate his fraudulent activity. Vosselman was introduced to Stearns via a contact from Stearns's business associate, Anwar Heidary – a money manager with whom Vosselman had also engaged in high-yield investment schemes at the expense of unsuspecting investors. In June of 1998, Vosselman

3

and Stearns entered into a business arrangement, whereby Vosselman agreed to act as Stearns's agent and solicit investors, whose money Stearns was supposed to place in medium term notes. Vosselman was to guarantee investors a forty percent monthly return, and he and Stearns were to divide evenly the remaining profits.

During the next two months, Vosselman secured $4.3 million from four investors. The investment funds were deposited into Vosselman's brokerage account and then wired directly to Stearns. During that period, Vosselman was in contact with Stearns by telephone five or ten times a day. One investor, Brent Butts, unaware of Vosselman's relationship with Stearns, invested $3.3 million with Vosselman between June 24 and September 25, 1998, based in part on Vosselman's representations that he had traded in medium term notes for over three years and had been so successful that he was thinking of retiring. Although the first payment was made on Butt's investment, the second payment, due in September, was not made. Butts voiced concern to Vosselman and began calling him on a daily basis. Vosselman, attempting to reassure Butts, told Butts not to worry and that "everything was . . . still working."

Vosselman eventually began avoiding the calls. When pressed, Vosselman finally identified Stearns as the trader, but then attempted to reassure Butts by telling him of Stearns's credentials and his experience trading medium term notes in Germany. Vosselman also provided Butts with a document supposedly generated by

Interpol showing Stearns's qualifications and with a copy of a printout of a Bloomberg screen supposedly showing that Butts's funds had been used to purchase a medium term note on the Abbey National Bank in the United Kingdom.  In addition, Vosselman told Butts that Stearns had an impressive home in Austin and that Vosselman was thinking of buying a ranch outside of Austin to facilitate their business dealings.  Vosselman finally resorted to giving Butts a series of excuses: that the funds had been wired to Stearns but the wire had been lost, that the wire was found but had been sent to the wrong bank, and that the money had been wired back to Morgan Stanley so that taxes could be withheld.  Finally, Vosselman told Butts that he and Stearns operated a hedge fund and that Butts's funds would be invested in the hedge fund if the problem with Morgan Stanley could not be resolved.

In October 1998, when the second payment was two-to-three weeks late, Butts insisted on speaking with Stearns.  Vosselman discouraged this at first but finally agreed to set up a conference call, which happened on October 23, 1998.  During this call, Stearns was evasive and refused to tell Butts when the second payment would be made.  Butts insisted on having a contact name and number for future reference, but Stearns gave him a phony name and number.[2]

Vosselman also solicited funds from another investor, Barrett

---

[2] Only after Butts's attorney got involved was the money recovered in April 1999.

Morrison, without disclosing his relationship with Stearns and under the pretenses that he was the trader. Again, Vosselman made various excuses when the first payment on the investment contract was due in October 1998, including falsely telling Morrison of the death of a close friend. He also falsely told Morrison that the money had been frozen because another investor had complained to state authorities.

During the course of all this misconduct, Vosselman received a number of gifts and/or payments from Stearns. In August or September of 1998, Stearns gave Vosselman a $98,000 gift to help him purchase a condominium. Similarly, between June and the fall of 1998, Stearns gave Vosselman $45,000 in gifts or salary.

**III.    ANALYSIS**

A.    <u>Sufficiency of the Evidence — Count Fifty-Five</u>

Stearns contends that the evidence was insufficient to sustain his conviction on count fifty-five, which charged him with money laundering to promote unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(I). Because Stearns timely moved for judgment of acquittal at the close of the government's case and again after both sides rested, this court reviews a sufficiency of the evidence challenge in the light most favorable to the verdict and upholds the verdict if, but only if, a rational juror could have found each element of the offense beyond a reasonable doubt. <u>United States v.</u>

Brown, 186 F.3d 661, 664 (5th Cir. 1999); United States v. Pruneda-Gonzalez, 953 F.2d 190, 193-94 (5th Cir. 1992); Fed. R. Crim P. 29(a).

To obtain a conviction under § 1956(a)(1)(A)(i),[3] the government must prove beyond a reasonable doubt that the defendant "(1) conducted or attempted to conduct a financial transaction, (2) which the defendant knew involved the proceeds of unlawful activity, (3) with the intent to promote or further unlawful activity." Brown, 186 F.3d at 668 (internal quotation omitted). Mere evidence of promotion of an unlawful activity does not satisfy the intent-to-promote element. Id. at 670. The government must show that "a dirty money transaction that in fact promoted specified unlawful activity was conducted *with the intent* to promote such activity." Id. However, "[t]his does not mean that there must always be direct evidence, such as a statement by the defendant, of an intent to promote specified unlawful activity." Id. In fact, "[d]irect evidence is seldom available." United

---

[3] 18 U.S.C. § 1956(a)(1)(A)(i) makes it illegal for:
(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity (A)(i) with the intent to promote the carrying on of specified unlawful activity; . . . .
Subsequently, the money laundering statute defines "specified unlawful activity" to include mail and wire fraud. See 18 U.S.C. §§ 1956(c)(7)(A), 1961(1).

7

States v. Johnson, 971 F.3d 562, 566 (10th Cir. 1992). "In many cases, the intent to promote criminal activity may be inferred from the particular type of transaction" or from the surrounding circumstances. Brown, 186 F.3d at 670; Johnson, 971 F.3d at 566.

Although an "intent to promote" cannot be inferred from the conduct of a "defendant who . . . deposits proceeds of some relatively minor fraudulent transactions into the operating account of an otherwise legitimate business enterprise and then writes checks out of that account for general business purposes," Brown, 186 F.3d at 671, "[w]hen the business as a whole is illegitimate, even individual expenditures that are not intrinsically unlawful can support a promotion money laundering charge." United States v. Peterson, 244 F.3d 385, 392 (5th Cir. 2001). For example, in United States v. Jackson, 935 F.2d 832, 840-42 (7th Cir. 1991), the court inferred "intent to promote" from the defendant's use of illegal funds to purchase beepers because the beepers played an important role in the defendant's drug trafficking scheme.

Count fifty-five alleged that Stearns used money obtained through wire fraud to pay two past-due mortgage payments totaling $36,368.39. Stearns does not dispute either making the payment or the source of the funds. Instead, citing Brown, he contends that the payment of the mortgage on his residence was a strictly personal expenditure and that the government failed to prove that the transaction was intended to promote unlawful activity.

8

We reject Stearns's contention, as this case is unlike <u>Brown</u>, in which an automobile dealership defrauded lenders by helping unqualified buyers obtain financing and then used those proceeds to satisfy ordinary business expenditures that bore no relation to the fraud. The court in <u>Brown</u> failed to find an "intent to promote" because the ordinary business expenditures failed to "play[] an important role" in the defendant's criminal scheme.[4] Instead, we find persuasive the Tenth's Circuit's decision in <u>United States v. Johnson</u>, 971 F.2d 562 (10th Cir. 1992), where the defendant, like Stearns here, used the proceeds of a wire fraud scheme to pay off the mortgage on his house. In finding sufficient evidence to support a money laundering conviction, the court stated:

> The evidence clearly showed that the defendant used the office in his home to carry out the fraudulent scheme. In addition, the defendant's aura of legitimacy was bolstered in the minds of investors who saw the defendant's house. The circumstances give rise to an inference that the defendant paid the mortgage on the house so that he could continue using the office in furtherance of the fraudulent scheme.

<u>Id.</u> at 566.[5]

---

[4] <u>United States v. Brown</u>, 186 F.3d 661, 670 (5th Cir. 1999).

[5] Although there is, admittedly, language in <u>Johnson</u> which suggests a distinction between paying off a mortgage and making a regular monthly payment, we do not find this distinction to be a meaningful one, as both courses of action protect the defendant's

9

In relying on the Tenth Circuit's case in <u>Johnson</u>, we are mindful of the Sixth Circuit's admonition that not all home mortgage payments support the "intent to promote" prong merely because the residence is used as a business office. <u>United States v. McGahee</u>, 257 F.3d 520 (6th Cir. 2001). That is, the court in <u>McGahee</u> rejected the government's argument because there the defendant's "home did not play an integral part in the embezzlement scheme," and "[p]aying for personal goods, alone, is not sufficient to establish that funds were used to promote an illegal activity." <u>Id.</u> at 527. Because in <u>McGahee</u> defendant's use of his home as his business office was "merely a convenience," "the reasonable conclusion [wa]s not that [the defendant] made the payment with the intent to promote the embezzlement, but rather with the intent to sustain his personal living quarters." <u>Id.</u>

The record here, however, reveals that this case is more like <u>Johnson</u>, than <u>Brown</u> and <u>McGahee</u>. Here, Stearns maintained an office at his home, where he operated portions of his scheme. When he was arrested, agents searching the house found business records and several documents used in the scheme, including forged letters that Stearns used to tout his investment offerings as risk-free. Some victims testified to fraudulent activities conducted in

---

"right to continue using the office and the home." Thus, the relevant teaching of <u>Johnson</u> is that a sufficient connection between a defendant's residence and his unlawful activity will permit a jury to legitimately infer that the defendant made a mortgage payment with "dirty money" with the intent to promote or further the unlawful activity.

10

Stearns's house. He held meetings there with investors and lenders, told potential investors that he traded bonds from home, and received cash at home on at least one occasion.

More importantly, Stearns used his expensive home to create an aura of legitimacy[6] for his investment scheme. He displayed to various potential investors either the house itself or his office facilities. One investor testified that the impressive nature of the house gave him a sense of comfort in his dealings with Stearns, and Vosselman mentioned the house when trying to comfort Butts after he failed to receive the second payment on his investment. Finally, when Stearns pursued the ill-fated Bank of America loan, he included a picture of his house with the loan application.

These facts distinguish this case from Brown, where the proceeds of fraudulent transactions were deposited into an operating account and then used to satisfy general business expenses unrelated to the fraud, and McGahee, where the court found that the defendant's home did not play a significant role in his embezzlement scheme. Instead, this case is closer to Johnson,

---

[6] See United States v. Oberhauser, 284 F.3d 827 (8th Cir. 2002) (concluding that transfers of illegal funds from a Ponzi scheme to a charity were more than mere "benign expenditures" because the transfers to charity promoted the continuation of the fraud, as the corporation "induced investors to give them money by stating their profits went to charity and by prominently displaying plaques commemorating their contributions," thus giving an aura of legitimacy to the enterprise); United States v. Savage, 67 F.3d 1435, 1440 (9th Cir. 1994) (stating that "circumstantial evidence of intent to promote a fraudulent scheme exists if the transfer lends an 'aura of legitimacy' to the scheme").

where the government established a link between the defendant's residence and his fraudulent scheme. Accordingly, because the connection between Stearns's house and his unlawful activities supports a jury inference that he made the mortgage payment with the intent to promote those activities, we affirm the jury's verdict on count fifty-five.

B.    Sentence Enhancement

Stearns further contends that the district court erred by overruling his objection to the enhancement of his offense level under U.S.S.G. § 3B1.1(a) for being an "organizer or leader" of an extensive criminal activity. "The district court's determination that a defendant is a U.S.S.G. § 3B1.1 organizer is a factual finding which this court reviews for clear error. A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole. This court reviews a sentencing court's application of the guidelines de novo." United States v. Giraldo, 111 F.3d 21, 23 (5th Cir. 1997); see also United States v. Alfaro, 919 F.2d 962, 966 (5th Cir. 1990).

Under U.S.S.G. § 3B1.1(a), a defendant's sentence may be enhanced if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (emphasis added). Although Stearns does not contend that he did not act as an "organizer or

12

leader"[7] or that the criminal activity was not "otherwise extensive," he does argue that no one else involved in the scheme qualified under the sentencing guidelines as a "participant" for him to lead or organize. That is, even under the "otherwise extensive" prong of § 3B1.1, "the defendant must have been the organizer, leader, manager, or supervisor of [at least] one or more other participants." Id. § 3B1.1, Application Note 2. See United States v. Ronning, 47 F.3d 710, 712 (5th Cir. 1995). "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, Application Note 1. In other words, to qualify as a participant, a person "need not have been charged or convicted" with the defendant but need "only have participated knowingly in some part of the criminal enterprise." United States v. Boutte, 13 F.3d 855, 860 (5th Cir. 1994).[8]

Stearns contends that the district court clearly erred in finding that Vosselman, Caron, and Wylie were participants in Stearns's scheme because it found only that they were knowledgeable of Stearns's misconduct, not that they were criminally responsible for the commission of the offense. Stearns relies on this court's

---

[7] "[A] leader or organizer must control or influence other people." Ronning, 47 F.3d at 712.

[8] See also United States v. Alfaro, 919 F.2d 962, 967 (5th Cir. 1990) ("We do not require each 'participant' to have committed each element of the offense; rather, we require each of the participants to play some role in bringing about the specific offense charged.").

opinion in United States v. Maloof, 205 F.3d 819, 830 (5th Cir. 2000), in which we vacated a defendant's sentencing enhancement and remanded for resentencing because the district court found only that "other persons knew what was going on," without "otherwise indicat[ing] that it had determined that [the participants] had intentionally or wilfully participated in the criminal conspiracy or point[ing] to the evidence in the record that would support such a finding." Id. This court stated, "Willful participation is an essential element of the crime of conspiracy; mere knowledge of a conspiracy does not itself make a person a conspirator." Id. (internal quotation omitted).

Although Stearns's argument has surface appeal, it is clear from a review of the whole record and the entirety of the district judge's colloquy that the district judge did not clearly err in finding at least one other participant in Stearns's crime, and thus enhancing Stearns's sentence.[9] Unlike in Maloof, the evidence in this record of the "willful participation" of others is clear. There is no dispute that Vosselman, Caron, and Wylie acted as intermediaries for Stearns, raising money from third parties for investment purposes and passing the money on to Stearns. It is

---

[9] Even if we were to find that the district judge applied the wrong legal standard in determining whether the individuals involved were participants, such a finding would not merit reversal here, as the district court's finding that Stearns was a § 3B1.1(b) organizer was not clearly erroneous. See United States v. Giraldo, 111 F.3d 21 (5th Cir. 1997) (affirming a district court's sentencing enhancement under § 3B1.1 based on the evidence in the record, despite the district court's legal error).

14

equally clear that, at a minimum, Vosselman (who testified under a grant of immunity) was so knowledgeable and intimately connected in Stearns's scheme that he unquestionably possessed the requisite "criminal intent" to qualify as a participant under U.S.S.G. § 3B1.1.[10] Vosselman knew that his investors had lost money in a similar high-yield investment program with Stearns's associate, Heidary. Nevertheless, Vosselman solicited investors on Stearns's behalf. Vosselman also accepted nearly $145,000 in gifts from Stearns, some of it even after Stearns had failed to pay Vosselman's investors. Vosselman became evasive and gave false explanations for Stearns's failures to make payments to investors, thus putting the investors' money at risk for an additional period of time. Furthermore, Vosselman misrepresented his qualifications and his role in the investment scheme to Butts and Morrison. Thus, it is clear that Vosselman "participated knowingly" in the scheme and "play[ed] some role in bringing about the specific offense[s] charged." Boutte, 13 F.3d at 860; Alfaro, 919 F.2d at 967. Because the district judge's factual findings are not implausible in light of the record read as a whole, we affirm the district court's sentencing enhancement.

## III. CONCLUSION

---

[10] Because the enhancement guideline requires only one participant, it is not necessary for us to consider whether Caron and Wylie were also participants.

For the foregoing reasons, the district court's judgment and sentence are AFFIRMED.